IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SENTRY INSURANCE A MUTUAL
COMPANY,

    Plaintiff,

      v.

IRONSHORE SPECIALTY
INSURANCE COMPANY,

    Defendant.

CIVIL ACTION FILE
NO. 1:15-CV-93-TWT

## OPINION AND ORDER

This is an insurance coverage dispute. It is before the Court on the Plaintiff Sentry Insurance A Mutual Company's Motion for Summary Judgment [Doc. 24] and the Defendant Ironshore Specialty Insurance Company's Motion for Summary Judgment [Doc. 23]. For the reasons set forth below, the Plaintiff's Motion for Summary Judgment [Doc. 24] is GRANTED, and the Defendant's Motion for Summary Judgment [Doc. 23] is DENIED.

T:\ORDERS\15\Sentry Insurance\msjtwt.wpd

# I. Background

This case arises out of a fatal accident that occurred on Airport Loop Road in Fulton County, Georgia on December 4, 2010.[1] Levon Alls was driving his tractor-trailer truck around 7 a.m. when, while attempting to merge onto Interstate 285, he collided with another vehicle.[2] After the collision, Alls stopped his truck, turned on his four-way flashers, and exited the truck to observe any damage to it.[3] While the truck was still on the road, Martha Edins struck the rear of Alls's tractor-trailer.[4] Edins died instantly upon impact.[5]

At the time of the accident, Alls was driving in the course and scope of his employment with Stafford Transport, Inc. ("Stafford").[6] Both Alls and Stafford are insured by the Plaintiff Sentry Insurance A Mutual Company ("Sentry"), and each policy provides $1 million in coverage per accident.[7] Stafford gave timely notice of

---

[1]     Pl.'s Statement of Facts ¶¶ 1-2.

[2]     Id.

[3]     Id. ¶ 2.

[4]     Def.'s Statement of Facts ¶ 18.

[5]     Id.  ¶19.

[6]     Id. ¶ 14.

[7]     Id. ¶¶ 1-2, 5-6.

the occurrence to Sentry.[8] Stafford is also insured through a commercial umbrella liability policy issued by the Defendant Ironshore Speciality Insurance Company ("Ironshore").[9] The Ironshore policy provides $4 million of coverage beyond the coverage provided by Sentry.[10] On December 7, 2010, Stafford notified Ironshore about the accident, and, seven days later, Ironshore's third-party claims administrator, York Risk Services Group, Inc. ("York"), acknowledged receiving the notification.[11] York, however, concluded that liability against the insured appeared remote and closed its file.[12] On January 14, 2011, Stafford provided a second notice to Ironshore, which was titled "General Liability Notice of Occurrence/Claim."[13] Ironshore responded, stating it had assigned a claim number and appointed an adjuster, but it did not provide further information.[14]

---

[8]     Id. ¶ 20.

[9]     Id. ¶ 8

[10]    Id. ¶ 9.

[11]    Pl.'s Statement of Facts ¶¶ 11-12.

[12]    Id. ¶ 15.

[13]    Id. ¶ 21.

[14]    Id. ¶¶ 24-25.

On May 5, 2011, a wrongful death suit on behalf of Edins was filed against Alls and Stafford.[15] Sentry received notice of the service, but Ironshore was not notified.[16] For defense counsel, Sentry retained attorney Gary Lovell, Jr., who conducted the initial investigation and valuation of the Edins action.[17] On January 20, 2011, Lovell advised Sentry that "liability seems questionable," and he estimated that damages would be between $400,000 and $500,000, assuming Stafford and Alls were held liable.[18] Then, on January 26, 2011, Lovell stated there was a 60-70% chance of convincing a jury that Edins was 50% or more negligent, meaning Alls and Stafford would not be held liable.[19] "If Edins prevailed on liability, Lovell estimated the verdict could be in the range of $500,000 to $750,000, and suggested setting reserves in that range."[20]

William Dinges eventually replaced Lovell as Stafford and Alls's defense attorney.[21] Dinges also stated he believed Edins was at least 50% liable for the

---

[15]     Def.'s Statement of Facts ¶ 39.

[16]     Id. ¶¶ 39, 54.

[17]     Pl.'s Statement of Facts ¶ 30.

[18]     Id. ¶ 31.

[19]     Id. ¶ 32.

[20]     Id.

[21]     Id. ¶ 33.

accident, and he assessed a reasonable settlement amount of $750,000.[22] On or around February 23, 2013, Dinges stated that there was "a significant potential for a high jury verdict," but he reiterated that he still believed Edins's actions indicated "a significant degree of negligence."[23] Then, on or around May 10, 2013, Dinges stated that a plaintiff's verdict could exceed $1 million, depending on the composition of the jury.[24] None of the defense attorneys, however, ever valued the claim at over $2 million – the attachment point for the Ironshore policy. Moreover, according to Brian Negrette – the Chief Operating Officer of Stafford's parent company – Stafford agreed with Lovell's and Dinges's evaluations of the case.[25]

The parties engaged in multiple settlement discussions. In November 2013, the plaintiff made a $2 million settlement demand; the defendants countered with a $500,000 offer.[26] Then, in May 2014, the plaintiff made a high/low offer of $2 million/$500,000, and the defendants countered with a high/low offer of $1 million/$75,000.[27] On May 13, 2014, the plaintiff proposed a high/low offer of $2

---

[22]   Id. ¶¶ 35-36.

[23]   Def.'s Mot. for Summ. J., Ex. L ¶ 29.

[24]   Id. ¶ 31.

[25]   Negrette Aff. ¶¶ 4, 6.

[26]   Def.'s Statement of Facts ¶ 45.

[27]   Id. ¶ 48.

million/$500,000, with an alternative lump sum demand of $1.75 million.[28] The defendants rejected this offer and responded with a high/low offer of $2 million/$250,000 and an alternative lump sum offer of $600,000.[29] The plaintiff rejected the defendants' counteroffer and did not make another settlement offer.[30]

The case then went to trial. On May 22, 2014, the jury returned a verdict of $4,018,000, which was reduced by a 25% apportionment of fault against Edins.[31] This resulted in a net verdict of $3,013,500.[32] One day after the trial, Dinges noted in his trial report that "he was shocked by the amount of the verdict," and that the verdict was "way beyond our evaluation of this case."[33] On May 29, 2014, Stafford notified Ironshore for the first time about the lawsuit.[34] Two days after notifying Ironshore, Sentry told the defense counsel that it needed legal research regarding "late notice"

---

[28]    Id. ¶ 49.

[29]    Id.

[30]    Pl.'s Statement of Facts  ¶ 50.

[31]    Id. ¶ 53

[32]    Id.

[33]    Id. ¶ 54.

[34]    Def.'s Statement of Facts ¶ 51.

to an insurance carrier.[35] Sentry contends that this communication occurred prior to it learning that Stafford had provided notice of the accident.[36]

Ironshore took the position that it did not owe Stafford coverage for the Edins suit because Stafford did not provide timely notice of the lawsuit. As a result, Sentry and Ironshore agreed to jointly fund the $1,013,500 portion of the judgment exceeding the Sentry policy limits, with both insurers retaining the right to seek reimbursement of the portion it paid from the other insurer.[37] On January 12, 2015, Sentry brought suit against Ironshore, seeking reimbursement of the $506,705 it paid in excess of its policy limits.[38] Both parties now move for summary judgment.

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[39] The court should view the evidence and any inferences that may be drawn in the light most favorable to the

---

[35]    Id. ¶ 55.

[36]    Pl.'s Statement of Additional Material Facts ¶ 33.

[37]    Def.'s Statement of Facts ¶¶ 63-64.

[38]    Pl.'s Statement of Facts ¶ 63.

[39]    FED. R. CIV. P. 56(a).

nonmovant.[40] The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact.[41] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.[42] "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."[43]

## III. Discussion

Sentry moves for summary judgment, claiming that Ironshore – as Stafford's excess insurer – is responsible for the portion of the underlying settlement that falls within its policy limits. Ironshore also moves for summary judgment. It initially argues that because Sentry made a bad faith or negligent refusal to settle the underlying lawsuit, Sentry should be responsible for the excess judgment.[44] "An

---

[40]    Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

[41]    Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[42]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

[43]    Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

[44]    It should be noted that "Georgia courts have upheld the right of an excess insurer to bring suit against a primary insurer based on a negligent or bad faith refusal to settle." See Great Am. Ins. Co. v. International Ins. Co., 753 F. Supp. 357, 363 (M.D. Ga. 1990) (citing Home Ins. Co. v. North River Ins. Co., 192 Ga. App. 551 (1989)).

insurer may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim within the policy limits."[45] "Judged by the standard of the ordinarily prudent insurer, the insurer is negligent in failing to settle if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk."[46] An insurer acts in bad faith if its "decision not to settle the case was arbitrary and capricious."[47]

The Court finds that Ironshore has failed to demonstrate by a preponderance of the evidence that Sentry acted negligently or in bad faith when it refused to settle the underlying claim. It is undisputed that none of the defense attorneys in the Edins action valued the case beyond the Sentry policy limits. For example, Lovell stated that Alls's liability seemed questionable and estimated the damages to be in the range of $500,000 to $750,000, assuming Stafford and Alls were held liable.[48] Dinges predicated a reasonable settlement value of $750,000 and stated that a verdict in

---

[45] Kingsley v. State Farm Mut. Auto. Ins. Co., 353 F. Supp. 2d 1242, 1247 (N.D. Ga. 2005) (quoting Cotton States Mut. Ins. Co. v. Brightman, 276 Ga. 683 (2003)).

[46] Cotton States, 276 Ga. at 685.

[47] Great Am., 753 F. Supp. at 363.

[48] See Pl.'s Statement of Facts ¶ 31.

excess of $2 million appeared extremely unlikely.[49] Thus, Sentry did not have "knowledge of clear liability and special damages exceeding the policy limits."[50]

The parties also engaged in multiple settlement discussions prior to trial.[51] For example, the plaintiff made a high/low offer of $2 million/$500,000, and the defendants countered with a high/low offer of $1 million/$75,000.[52] The plaintiff then made a high/low proposal "of $500,000/$2,000,000 . . . and an alternative lump sum demand of $1,750,000."[53] The defense rejected this offer and made "a high/low of $250,000/$2 million or, alternatively, a $600,000 offer,"[54] but it was rejected by the plaintiff. Thus, the defense took part in meaningful settlement negotiations and was willing to modify its initial counteroffer.[55] In total, this evidence indicates that Sentry acted reasonably when determining whether to settle the lawsuit.

---

[49]   Id. ¶¶ 37-38.

[50]   See Cotton States, 276 Ga. at 685.

[51]   Pl.'s Statement of Facts ¶ 46.

[52]   Def.'s Statement of Facts ¶ 48.

[53]   Id. ¶ 49.

[54]   Pl.'s Statement of Facts ¶ 50.

[55]   See Great Am. Ins. Co. v. International Ins. Co., 753 F. Supp. 357, 364 (M.D. Ga. 1990) (holding that the primary insurer acted unreasonably when it, "in absolute disregard of the opinion of the attorney it hired, . . . *never* modified, altered, or adjusted it initial determination of liability and *never* undertook serious settlement negotiations" (emphasis in original)).

Ironshore, on the other hand, fails to put forth evidence that indicates Sentry acted unreasonably or did not consider the interests of the insured. Rather, it argues "that if a primary carrier rejects a settlement offer within its policy limits believing that there is no excess insurance, the risk of an excess verdict remains with that primary carrier."[56] But Sentry's lack of knowledge does not excuse Ironshore from demonstrating by a preponderance of the evidence that Sentry acted unreasonably.[57] Consequently, the Court rejects Ironshore's claim that Sentry made a bad faith or negligent refusal to settle the underlying lawsuit.

Next, Ironshore argues that Stafford failed to provide timely notice of the Edins lawsuit, making Sentry liable for the excess judgment. "Whether notice is timely is ordinarily a question of fact for the jury to determine."[58] "However, courts may rule on this question as a matter of law if under all the facts and circumstances, it can be determined that the insured's delay in providing notice to the insurance company was

---

[56]     Reply Br. in Supp. of Def.'s Mot. for Summ. J., at 6.

[57]     See Great Am. Ins. Co., 753 F. Supp. at 363 (noting that the excess insurer must "prove by a preponderance of the evidence that [the primary insurer] failed to use that degree of care which is exercised by an ordinary prudent insurer").

[58]     Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co., 111 F.3d 852, 860 (11th Cir. 1997).

unjustified and unreasonable."[59] "Compliance with a prompt notice provision acts as a condition precedent to coverage under the policy."[60] "The Eleventh Circuit, interpreting an excess coverage contract, has held that a four-month delay between the lawsuit and the date of notice was unreasonable under Georgia law, absent a valid excuse."[61]

Here, the liability policy issued to Stafford provides:

2.  If a claim is made or **Suit** is brought against any **Insured** which is reasonably likely to involve this Policy, you must notify us in writing as soon as practicable.

3.  You and any other involved **Insured** must:
    a.  immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or **Suit**;[62]

Ironshore contends that Stafford did not comply with either notice provision. First, it argues that paragraph three of the notice provision operates independently of paragraph two. According to Ironshore, this means the insured is required to send

---

[59]   Plantation Pipe Line Co. v. Continental Cas. Co., No. 1:03-CV-2811-WBH, 2006 WL 6106248, at *15 (N.D. Ga. Sept. 25, 2006) (citing Richmond v. Georgia Farm Bureau Mut. Ins. Co., 140 Ga. App. 215, 220-21 (1976)).

[60]   South Carolina Ins. Co. v. Coody, 957 F. Supp. 234, 237 (M.D. Ga. 1997).

[61]   North River Ins. Co. v. Gibson Tech. Servs., Inc., 116 F. Supp. 3d 1370, 1378 (N.D. Ga. 2014) (emphasis omitted).

[62]   Def.'s Mot. for Summ. J., Ex. C (emphasis in original).

copies of demands, notices, summonses, or legal papers for every claim or suit brought against it.[63] But paragraph three states that an insured must only provide copies for "*the* claim or Suit."[64] This phrase clearly refers back to paragraph two and thus limits the insured's duty to provide copies of claims or suits that are reasonably likely to involve the Ironshore policy. If Ironshore wished to require copies of legal papers for all claims or suits, it could have used the term "any" or "all" to modify "claim or suit," but it did not.[65] Consequently, its argument is without merit.

Next, Ironshore argues that if Stafford's notice on January 14, 2011 is notice of a claim under the policy, then Stafford was required under paragraph three to send copies of the Edins complaint.[66] In response, Sentry contends that Stafford was not required to send copies of the Edins complaint because the claim was not reasonably

---

[63]    See Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J., at 10.

[64]    Def.'s Mot. for Summ. J., Ex. C (emphasis added).

[65]    See Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co., 111 F.3d 852, 860 (11th Cir. 1997) (holding that if the insurer intended to require notice of all claims, then "the policy would simply require notice of all claims against the insured"); Briggs & Stratton Corp. v. Royal Globe Ins. Co., 64 F. Supp. 2d 1346, 1354 (M.D. Ga. 1999) (holding that because the policy required notice "whenever either a claim is made or a suit is brought against the insured," the policy required notice of all claims).

[66]    See Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J., at 12.

likely to involve the Ironshore policy.[67] In support of its argument, Sentry points to Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.[68] There, the Eleventh Circuit addressed an excess insurance policy that provided: "[Insured] shall immediately give to [insurer] written notice . . . of an occurrence, claim or suit which is reasonably likely to involve [insurer] under this policy."[69] The Evanston case involved an auto accident that resulted in a fatality.[70] The insured had immediately notified the primary insurer of the occurrence and lawsuit but waited until the first day of trial to notify Evanston, an excess insurer.[71] The defense attorneys valued the case at less than $3.5 million, but the jury returned a verdict totaling $23.5 million.[72] Evanston contended that it was not liable for the excess verdict because the insured's notice was untimely.[73]

The Eleventh Circuit disagreed. It held that because the insured exercised due diligence and relied on the advice of its competent attorneys when it made its

---

[67]   See Pl.'s Mot. for Summ. J., at 18.

[68]   111 F.3d 852 (11th Cir. 1997).

[69]   Id. at 860.

[70]   Id. at 854.

[71]   Id. at 854, 856.

[72]   Id. at 857.

[73]   Id. at 860.

evaluation of the case, the insured's failure to give earlier notice was reasonable as a matter of law.[74] The Court noted that the word "likely" "means probable not merely possible."[75] And the phrase "reasonably likely" "clearly contemplates that the insured is not required to give notice every time there is a claim against it."[76] Thus, "[w]hen notice is required is, necessarily, a question of judgment," and "[t]his standard requires the insured to base its judgment regarding the amount of the claim against it upon sound reasons."[77] The Court emphasized that the policy language does not protect the excess insurer "against a judgment that was not 'reasonably likely' but which, nonetheless, materializes."[78]

Sentry contends that, like the plaintiff in Evanston, Stafford acted due diligently and followed the advice of its attorneys when determining the value of the claim. The Court agrees. Three days after the accident, Stafford  reported the occurrence to Ironshore.[79] Ironshore's third-party claims administrator, York, acknowledged the

---

[74]     Id. at 862.

[75]     Id. at 860 (quoting Lumbermens Mut. Cas. Co. v. Plantation Pipeline Co., 214 Ga. App. 23, 25 (1994)).

[76]     Id.

[77]     Id.

[78]     Id.

[79]     See Pl.'s Statement of Facts ¶ 11.

occurrence but concluded that liability was doubtful and closed the file.[80] Although the parties dispute whether the second notice was duplicative of the first notice or was notice of an actual claim, it is undisputed that Ironshore acknowledged receiving the second notice and kept the file closed.[81] Sentry retained competent counsel for Stafford and Alls. None of the defense attorneys involved in the representation predicated the verdict would reach $2 million.[82] Moreover, the attorneys concluded that the defendants' liability seemed questionable. Lovell stated "there was a 60-70% chance of convincing a jury Edins was 50% or more negligent in causing the accident."[83] Dinges predicted that liability would be equal for each party, meaning that, under Georgia law, the plaintiff could not recover.[84] In sum, this evidence demonstrates that Stafford reasonably believed that its liability would not exceed $2 million.[85]

---

[80]     Id. ¶ 15.

[81]     Id. ¶ 24.

[82]     Id. ¶¶ 31-39.

[83]     Id. ¶ 32.

[84]     Id. ¶ 35; see Fathallah Aff., Ex. 2 (noting on three separate occasions that each party's liability appeared to be equal).

[85]     Cf. North River Ins. Co. v. Gibson Technical Services, Inc., 116 F. Supp. 3d 1370, 1380 (N.D. Ga. 2014) (holding that because the insured disregarded counsel's advice that the claim potentially exceeded the primary insurance policy and that it should notify the excess insurer, the insured's justifications for its delay in

In response, Ironshore contends that because the defense attorneys and Sentry "never determined what was 'reasonably likely' respecting the Ironshore policy during the Edins suit," Sentry cannot claim that Stafford relied on Sentry's or the defense attorneys' advice.[86] But the pertinent question is not whether Sentry and the defense attorneys specifically evaluated the Ironshore policy;[87] it is whether Stafford, based on the defense attorneys' and the insurer's evaluation of the underlying case, reasonably believed that the verdict would not exceed the Sentry policy limits.[88] Ironshore then argues that the defense attorneys and Sentry did value the underlying action in excess of $1 million. It cites to two letters sent to Alls warning that the verdict could exceed $1 million and a quote from a defense attorney warning that the verdict could exceed $1 million.[89] While this evidence may indicate a verdict exceeding $1 million was probable, it does not make a verdict exceeding $2 million probable.

---

notifying the excess insurer were unreasonable).

[86]    Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J., at 17.

[87]    See Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co., 111 F.3d 852, 855-56 (11th Cir. 1997) (noting that the defense attorneys were not aware prior to trial of the excess insurance policy at issue).

[88]    Id. at 862.

[89]    Def.'s Br. in Opp'n to Pl.'s Mot. for Summ. J., at 18.

Next, Ironshore argues that several facts surrounding the accident made Alls's liability more probable, most notably that Alls was criminally charged with vehicular homicide.[90] To be sure, these facts do increase the possibility that Stafford and Alls would be held liable, but that does not mean that Stafford's evaluation of its liability was unreasonable. "We do not ask whether [Stafford's] evaluation of the case was 'correct' or 'mistaken' but whether, at the time, it was based upon reason."[91] And – as previously discussed – both the defense attorneys and Sentry evaluated Edins's liability at least 50% and never valued the case beyond the Sentry policy limits.[92]

Finally, in the alternative, Ironshore asserts an argument with respect to the "Commercial Automobile Liability Limitation Endorsement" in the Stafford policy.[93] The endorsement specifically excludes coverage for automobile liability, but the

---

[90]    Id. at 19.

[91]    Evanston, 111 F.3d at 862.

[92]    Ironshore also cites to Southern General Insurance Co. v. Holt, arguing that it is more analogous to the present case than Evanston. But Holt concerned whether an insurance company was guilty of bad faith or negligence in refusing to settle an underlying lawsuit. 262 Ga. 267, 276 (1992). Moreover, in Holt, the insured's liability was clear, and the claims manager testified that the underlying claim was "a policy limits case." Id.

[93]    Def.'s Mot. for Summ. J., at 23.

exclusion does not apply if the primary insurance policy provides automobile liability coverage.[94] The endorsement then states:

> Coverage under this policy for such Automobile Liability Bodily Injury or Property Damage will follow the terms, definitions, conditions and exclusions of Scheduled Underlying Insurance, subject to the . . . terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by Scheduled Underlying Insurance.[95]

Based on this paragraph, Ironshore contends that its policy follows the Sentry policy's notice provision. Specifically, Ironshore argues that "[b]ecause the Ironshore Policy expressly provides that it affords no broader coverage than the Sentry Policy in the context of automobile liability, the Ironshore Policy follows this more stringent notice provision of the Sentry Policy, and Ironshore too must receive immediate notice of a suit."[96]

The Court disagrees. As Sentry correctly points out, there is a more reasonable interpretation of the endorsement: the "no broader" clause is used to ensure that if the primary insurer does not provide coverage for a particular automobile accident, the

---

[94]   See id., Ex. C.

[95]   Id., Ex. C.

[96]   Id. at 24.

excess insurer will not have to defend or indemnify the insured for that accident.[97]

Here, Sentry has provided coverage for the automobile accident, and, therefore, coverage under the Ironshore policy is still subject to the terms and conditions of the Ironshore policy. In addition, Ironshore's interpretation would require the insured to "compare every term and condition in the myriad underlying policies to the terms and conditions of its excess policy, determine which is the 'most stringent,' and then adhere to those terms and conditions."[98] This is burdensome and creates uncertainty for the insured. Accordingly, the Court concludes that Ironshore's argument regarding the endorsement is without merit.

## IV. Conclusion

For these reasons, the Court GRANTS the Plaintiff Sentry Insurance A Mutual Company's Motion for Summary Judgment [Doc. 24] and DENIES the Defendant Ironshore Specialty Insurance Company's Motion for Summary Judgment [Doc. 23].

---

[97]    Even if Ironshore's interpretation of the endorsement was reasonable, "[w]hen the language of an insurance [policy] is ambiguous and subject to more than one reasonable construction, the policy must be construed in the light most favorable to the insured, which provides him with coverage." Western Pac. Mut. Ins. Co. v. Davies, 267 Ga. App. 675, 680 (2004).

[98]    Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J., at 22.

SO ORDERED, this 30 day of June, 2016.


                        /s/Thomas W. Thrash
                        THOMAS W. THRASH, JR.
                        United States District Judge